Amphastar Pharma SA v. Amphastar Pharm V. Amphastar Pharma SA v. Amphastar Pharma When you're ready, Mr. Donn. I'm ready. Good morning, Your Honors. May it please the court. Your Honor, I submit that the District Court lost its way in reaching its conclusion that it should grant summary judgment of inequitable conduct, and a perfect starting point is the District Court's statement at 833 of its opinion. It said, The question is not whether use of the 40 mg dose was reasonable, that's its quote, but whether or not the Usanne Declaration omitted material facts through failing to tell the Patent Office that different dosages were involved in the comparison. But the case law of this Court, and particularly the Monsanto case, which is a highly relevant case, is to the contrary. The question is whether the conduct was reasonable. And I submit that the evidence in this case strongly supports the view that not only was the conduct reasonable of Aventis and Dr. Usanne, but at the very least there are genuine disputed issues of material fact which should have precluded the grant of summary judgment. Didn't he have to disclose the dosage level? Your Honor, he did not have to disclose that the 4144 level was 60 mg, and let me explain why. The cornerstone of our position is that, and it's undisputed, that what you compare when you compare therapeutic compounds, low molecular weight heparins or heparin, you compare the preferred therapeutic dose. That fact is undisputed. That's exactly what Dr. Usanne did. He had the 40 mg dose of the debris compound, and it was preferred in his view because it had the best efficacy-to-tolerance ratio. It had been confirmed in a second study, the PK-121 study, and the 60 mg dose had bleeding in some post-operative patients. The 60 mg dose of the comparative compound, namely the 4144 compound, was the only therapeutic dose he had. It was the best therapeutic dose known to him for the 4144 compound. So what he was doing was he was comparing the best doses. The examiner did not need to know that the dose of the 4144 compound was 60 mg. Why? She didn't need to know that because, in fact, Dr. Usanne gave her all of the 60 mg data for the debris compound. He gave her all the 40 mg data for the debris compound. He gave all of the 4144 data for the compound, and the patent expressly disclosed that the debris compounds were dose-independent. The significance of that is that the examiner had a motive to examine all of the debris data that she had in front of her if she wanted to, but she would have known, just as those skilled in the art knew, that the best comparison is with therapeutic doses. Now, in fact, Dr. Usanne, it's totally inconsistent with an intent to deceive that he disclosed the actual data, the dosage form for the debris data. It's absolutely inconsistent that he even gave dosage forms for that data because that would have told the examiner that she didn't have dosage data for the 4144 compound. It is inconsistent with everything that he would have given her the data that he would have mentioned dosages and yet have an intent to deceive. Mr. Dunn, let me just interrupt. You mentioned there's sort of two alternatives. I mean, we could decide this really, which goes to the heart of the merits, but let's assume you said your second alternative was, at a minimum, there are questions of facts left. Can you tell me what those questions of facts are? I mean, if we were to say, okay, we have persuaded summary judgment was just not the way to go here, what is it in terms of additional evidence that is the reason that it's necessary to send it back on questions of facts? Your Honor, I will answer your question by listing the disputed issues of material fact, by listing areas where the judge weighed evidence, which the judge should not have done, areas where the judge drew inferences that he should not have drawn on summary judgment, and where he made improper credibility determinations. Can I just ask you one more question, and you can include the answer in your summary, which is that with regard to the inferences question, to the extent there were inferences, then does that mean we just send it back? And in a context where inferences don't have to be drawn in your favor, he just looks at the same record and reaches, presumably, maybe the same conclusion? No, Your Honor. We submit that there should be a trial, that there are genuine issues of disputed material fact that require a live trial with live testimony where Dr. Uzan can testify, where the judge can look Dr. Uzan in the eye and see whether he's telling the truth or not, as well as the other witnesses in this case. And here are the disputed issues of material fact. The court found that Dr. Uzan did not disclose to the examiner that the experiments were done at different doses, even though Dr. Uzan expressly said in his declaration that, in fact, the half-life comparison he was making was very significant because it enables the same effect to be achieved with lower dosages. Now, the judge says that doesn't mean lower dosages, but Dr. Uzan's mother tongue is French. He testified in French in his deposition, and he testified that that's what it meant to him. The judge made a credibility determination when he drew an inference against Dr. Uzan on that interpretation. So at the very least, there's a genuine issue of material fact as to whether or not the patent office was told that there were different dosages. Also— But that really just depends upon reading the record, doesn't it? No, it doesn't, Your Honor, because— Do you think there's an intent issue involved in whether or not he actually disclosed these dosages? There is an intent issue. The judge said he precluded the examiner from examining 40 versus 60, and we say that that raises intent issues. It raises materiality issues. He says he did disclose. He disclosed all the 60-milligram data for debris that the examiner could have looked at and compared. But then he kind of suggests away from the disclosure by saying— And you get the same effect with lower doses. Your Honor, he said you get the same effect by lower doses because he was doing what one skilled in the art does. They compare therapeutic dose to therapeutic dose. But he said more. In the declaration that he provided in 1801, he explicitly directed the examiner to the fact that he was attaching Tables 1, 10, and 11, which refer to the compound of the invention— 10 was 40 milligrams, 11 was 60— and Tables A and 3, which refer to the compound of Mardigian. He actually, on the first page, one of the early pages of his declaration, told the examiner he was doing this. Moreover, he gave the examiner photocopies of the exact tables from the source of that material. Those tables did not include any dosage written on them for the 4144 compounds. It included dosages for the other compounds. So what he did was perfectly reasonable, perfectly explainable. And I think we need a trial in order to test his credibility. The judge also found— On the intent question, and that goes to the intent. It goes to the intent question, exactly. Now, is that—we kind of interrupted your list. I'm guilty of that. I apologize. But the different doses question was the first fact issue. You're saying intent is the second fact issue? No, let me just read you the list of other issues. The other issue, the court found that he deprived the examiner of the opportunity to compare data at equal 60 milligram doses when Dr. Huzan, in fact, did provide all the data. The court found that Dr. Huzan repeatedly misrepresented the evidence when Dr. Huzan made the comparison of preferred therapeutic doses. It's undisputed that there's a statistically significant difference between the 40-debris and the 60-4144 compound. He weighed evidence. He found that Dr. Huzan had admitted that he did not tell the examiner that there were different doses. And he quoted something from the spec in which Dr. Huzan said, I didn't tell the examiner it was 60. So not only did he not accept the evidence, he weighed the evidence. He reached the wrong conclusion. And we, and Dr. Huzan, needs an opportunity to get before the judge and explain his position, to explain why he picked 40. I'm getting back to the point, I think, that Judge Rader and Judge Prost were discussing with you. What is the materiality issue? I understand the intent issue, but there's no question, is there, but that the dosage data was material. Let me explain why that is not so. Yeah, that's what I'm having a little bit of. I see your intent arguments, but why is the dosage data information not material? Leaving aside what was said. Our position is it was not necessary for the examiner to know that 4144 was at 60. And the reason it was not necessary is the examiner had all of the data the examiner needed in order to evaluate, to make the comparison. She had the 40 debris data, 40 milligram, and she had the 60 milligram debris data. And she also had the, what ends up being the 60, 4144 data. What you're saying is there was a material issue here. We're obviously dealing with a material issue, but that there was nothing material withheld. I'm saying there was nothing material withheld, and I'm also saying that the examiner did not need to know the only materiality issue really is 60. Well, there are two issues. One was the examiner told there were different doses, and two was the examiner told that there was a 60 milligram dose that was the comparison dose. We say that Dr. Uzan did tell the examiner that there were different doses. That's the quote I read. And secondly, we're saying the examiner, the number 60 was not material. Why is this district judge saying there's not even a scintilla of evidence for your case? Your Honor? District judges don't, they miss occasionally, but they don't usually miss as far as you're accusing them of missing. Your Honor, with due deference to the district court judge, I submit he got it wrong. There's not only a scintilla of evidence, there's overwhelming evidence, and we've explained it. In the judge's analysis, the judge never mentioned the fact that we had provided 60 milligram debris data. The judge never mentioned the fact that Dr. Uzan followed the conventional practice of comparing preferred therapeutic doses. So when the judge doesn't mention two very critical facts, and when the judge concludes that a statement that is reasonably susceptible of two meanings can only have one meaning, you can see why he would say there's not even a scintilla of evidence. When he says that the data represents an increase of 250 percent in half-life, is that a misrepresentation? No, it is not a misrepresentation. There were two declarations. The first declaration compared half-lives of patients whose half-life was greater than four and a half hours. If you use those numbers, we came up with 250 percent. That number turns out to be inaccurate, but that's not an issue in the case. It turns out that there are several errors made that don't really go to the heart of what we're talking about today. But for purposes of this case, that number was accurate at the time. The examiner said, look, I don't like what you've given me. I want some statistically significant material. So in the second Uzan declaration, he provided the 60 milligram debris data, the 40 milligram debris data, and all of the data for the 4144 compound. At that point, he was no longer comparing patients above four and a half hours. At that point, he was just comparing mean half-lives, and therefore the number dropped. It was still a difference. It was a 30 percent difference. So the 250 percent number is totally accurate. There's nothing wrong with it other than the fact that it may be 260, 240, or something like that. I'm still having a problem. I understand fully your argument with respect to intent. You want Dr. Uzan to testify and bring in other evidence. But I am having a hard time with materiality. Where is there a fact issue there? I mean, you pointed out the statement about dosage, and you pointed out the 60 milligrams and so forth. I understand that. But the record speaks for itself on that. How is further fact-finding going to bear on that? Well, the answer is on materiality. I'll explain first why it is not material. I think implicit in your question was you don't see why it is not material. And the simple answer is the examiner was provided all of the 60 milligram debris data. The examiner was also told that debris compounds are dose-independent. That made all of the data in the 60 milligram set as well as the 40 milligram set potentially relevant if the examiner was interested in it. All she had to do was she had all the data in front of her. It didn't make any difference whether she knew that 4144 was precisely at 60. It could have been at 40, 60, 80, or whatever number. What she needed to know was if she wanted to compare them, could she? And she could. So that's why that information was not material. Now, perhaps one can say that there are no disputed issues of material fact on that, but the district court judge didn't even accept that. And so that's a disputed issue. I just don't see either way. I'm having a hard time seeing fact questions on the materiality issue. He seems to be making an argument based on facts that aren't in dispute. And I'm thinking where's the materiality? He's making an argument based on facts that we know. Well, materiality is a fact question. Intent is a fact question. And combining, averaging, comparing the two, of course, is a discretionary question. There's a dispute as to whether or not 60 was material. And that is a genuine issue of material fact. Was the withholding or the non-cite of 60, which I think is readily explainable, was that a material event? And I think that's an event that needs to be tried. Thank you, Mr. Dunner. Thank you, Your Honor. Mr. Weir, the court will restore Mr. Dunner's rebuttal time of three minutes. Would you give Mr. Weir an additional three minutes should he need to use it so we keep our time balanced? Mr. Weir, you may proceed. Thank you, Your Honor. May it please the court, I'd like to focus the court's attention specifically on subparagraph 2 of example 6 in the 618 path. Where exactly is that? That's A1256. If the court recalls, paragraph 6 is where they make the comparison between the Martiguillan prior art and the claim convention. Paragraph 2 follows the report that they make on the claim products. Column? Column 9. Paragraph 2. In subparagraph 2, it's about line 52. And after they give you the dose information for the claimed product, they state in paragraph 2, under identical dosage conditions, intact heparin injected intravenously possesses a half-life of approximately 0.6 hours. So they're saying under identical dosage conditions. If you move on to paragraph 3, that's when they report when the product was prepared according to the process described in EP40144. They do not disavow that that comparison is made at identical dose conditions. They say nothing. If you go on to paragraph 4, that's when they come back and give more data based on the claimed product. That states a second study carried out under similar conditions. And it goes on to report a 40 and 20 milligram study. No effort is made to convey to the reader that Martiguillan is being compared at a different dose. Particularly in light of the statement in paragraph 2. Take a look also at the 40 milligram dose report in paragraph 1. They use a 4 1⁄2 hour time frame for the percentage. For the 60 milligram dose, they use a 3.7 hour time frame. In paragraph 4, for the 40 milligram dose, they use a 4 1⁄2 hour time frame. So they consistently use 4 1⁄2 hours when they're talking about a 40 milligram dose. When they did the 20 milligram dose, you can see they used 3.9 hours. Look at Martiguillan in paragraph 3. They chose a 4 1⁄2 hour time frame to compare. The reader is led to believe that Martiguillan is at 40 milligrams because they're comparing 4 1⁄2 hours to 4 1⁄2 hours. That's the gist of what's going on. And this paragraph 6 was artfully crafted to take the reader exactly down that road. And they continued that same basic misrepresentation throughout the entire prosecution of the patent because every comparison, every argument they made to the examiner was comparing the 40 milligram dose to what the examiner did not know was the 60 milligram dose for Martiguillan. Even the statistical analysis at the end was based on the 40 milligram study, not the 60 milligram study for Martiguillan. The therapeutic dose to therapeutic dose? Well, that argument is, as you point out, there's no support in the record for that other than Mr. Ouzon's self-serving statement. Note that why would you say if someone skilled in the art always compares the therapeutic dose, why would you say in paragraph 2 under identical dosage conditions? You wouldn't say that. Also, the claims in this case, claims 24, 25, 27, 28, 30, all relate to treatment. None of them are limited to any specific dose. There is no disclosure in the patent of any preferred dose. The data that they rely on, other than Dr. Ouzon's testimony, is this PK121 study, and that's at A2527-28. And that study gives data on a 20 milligram study and on a 40 milligram study and doesn't distinguish between them. It doesn't say, well, this is the preferred therapeutic dose. So there is nothing that supports this litigation-motivated claim that, well, you really do compare therapeutic doses. But accepting that for the sake of argument, we're here on summary judgment, and the question is intact. And so as you describe this, you use the word it's very artfully done, isn't at bottom, I mean, with intent. I mean, there's a question of credibility. There are questions of fact. But there are also inferences that have to be drawn in favor of the other side on summary judgment. So given that, the inferences, I mean, I am having some difficulty seeing how drawing the inferences on the other side, but on the question of intent, you could resolve this matter on summary judgment. Could you address that? You only have to draw inferences that are permissible or reasonable. You don't have to draw every possible inference, even if unreasonable. The district court got it right in saying that these arguments about bleeding, preferred therapeutic dose, have nothing to do with the fundamental failure to disclose that Mardigian was at a 60 milligram dose. That is where the examiner was misled. So these arguments are not material to the issue of intent to deceive because they have nothing to do with the fundamental misrepresentation that was done originally and throughout the patent's prosecution. But that was the judge's view. I mean, presumably one would say on the other side that Mr. Ouzon had a different view of the matter. Well, again, this court— In terms of what his intent was. This court in paragon of podiatry said self-serving, specious, uncooperative, conflicting testimony does not raise a genuine issue of material fact. If Dr. Ouzon can come in and say, for example, with respect to his declaration, that even though it says—it doesn't say that I'm comparing lower doses. Anyone reading it knows it doesn't say that. But I believed, subjectively believed, that it did say something it didn't say. You would never have summary judgment in any case involving a misrepresentation of fact of any kind because the person who makes the representation would just say, I subjectively, regardless of how absurd my belief is, believed that I was saying something different than I clearly said. The interesting— I don't know that the credibility would be judged. The judge might well find, when the person got on the stand, might well conclude that the person was not credible. And that may, if this case goes back on intent, I don't know what will happen. But if it does, it may well be that if Mr. Ouzon testifies, the judge would not find him credible. Well, but the point that Mr. Ouzon was making that in his declaration he disclosed he was using lower doses is specious. He didn't say that at all. In fact, when you look at what he said, he was saying, there's a 250 percent difference between the claim compound and the prior article. And he said, because of that difference, you're assuming the same dose because the claim composition has a better half-life at the same dose. I can now lower the dose and get the same effect as the prior article. So what he was actually saying was, is I do have the same dose. I'm comparing the same dose, so I can just lower the dose for the claimed invention. So he was misleading the examiner. He wasn't saying that. And that makes an interesting point, too, is that he was actually saying that it was not dose-dependent. When he says I can get the same effect as the prior article dose, he was telling the examiner there is no dose independence. So for him to come in and say, well, I believe, subjectively believe, that I was telling the examiner that there was a different dose is specious. It's just not supported by what he actually was in fact saying. And the other interesting point on that is that 60 milligrams means the same thing in English and in French. Dr. Ouzan, in his first declaration, said the comparison data is very significant because it enables the same effect to be achieved with lower dosages. Why hasn't he pointed to the dosage difference with that statement? Because when he says same effect, he's talking about the effect of the prior art. He's not talking about the same effect of the claim compound. The beginning part of the paragraph, the sentence that precedes the portion that's been quoted in his brief says the difference between us and the prior art is 250%. Because of this difference between us and the prior art, I can lower the dose and get the same effect as the prior art. So he's only disclosing, he's essentially disclosing that I am now, I'm telling you I've got the same dose, but because our half-life is so much greater, I can lower the dose of the claim product. So that's what he's saying. So he's not disclosing that there was a lower dose. And equally important is that he did not disclose the 60 milligrams, that the prior data was at 60 milligrams, because that in and of itself prevented the examiner from making a comparison with the 60 milligram data relating to the claim product. When you compare those two numbers, they actually overlap. So the examiner was misled, led down the path of comparing 60-40 when she didn't know it was 60. She was led down the wrong path and never told to come back and compare 60-60. You compare 60-60, there is no difference. There is no 250% difference. That basic statement is not true when you compare 60-60. They make the argument in their brief that the examiner had all the data before her. Well, she did not. She did not have the fact that the Markigianni study was done at 60 milligrams. That was the key part of the data, and she was led away from making the comparison they said she did. This examiner was being very diligent. You can look through the prosecution history, and she was repeatedly saying to them time and again, I don't see that there is a difference here in the data that you're presenting me, and that was the 40-60 data that had a bigger difference. Had she known and had she been told that it was 60-60, the difference was less and overlapping. We submit she wouldn't have allowed the claims, or they would have had to narrow the claims to get them allowed. They make the argument about dose independence, and it's disputed that these products are dose independent. Actually, what the specification says in column 1, and that's at A1252, it says, column 2, beginning at line 58, it says, for example, the mixtures of the present invention exhibit a half-life longer than other known preparations and longer than mature heparin. Moreover, in relation to the latter, it will be appreciated that the half-life of the mixtures of the invention is independent of the dose injected. They're making a relative statement. They're saying as compared to heparin, it is dose independent. They're not making the broad statement that it is otherwise dose independent. The studies that they report that they rely on in their brief that talk about dose independence, one of them is the 1986 Freidman article. In that article, he actually reports data for a 20-40 comparison, 40-60, and then a 40-80. And in the 40-80 study, he reports that there is a significant difference, albeit small, but a statistically significant difference in the half-life on the dose. And neither of the articles that they cite reach the conclusion that it is dose independent. They say that it is stable over various doses or comparable or compatible over various doses. So there's no support in the record for even that statement. This idea of bleeding, there's just no support whatsoever in the record for that. And as the examiner pointed out, I'm sorry, as the judge pointed out, they relied on the 60-milligram study for the claim composition in Example 6, which would be inconsistent with all these arguments that they're making. They cite, they submit on appeal for the first time the expert declaration of this Dr. Weitz. And if you look at his declaration, if you even consider it, all he does is quote back to Mr. Ouzon's testimony. There's just no support whatsoever for this idea that it was bleeding. And none of this, none of these arguments, therapeutic dose, bleeding, were ever told to the examiner. The examiner was never told that. Had they told her that Mardigian was actually at 60 milligrams and she would have made the comparison 60-60, well, there's no big difference, then they may have had to come back and justify that comparison to the examiner in the first instance, and there would be a record on that. Counsel made the argument that we don't dispute that these are the preferred therapeutic doses and so on and so forth. Actually, that's not correct. There's just no evidence to support that that's in fact the case. Well, I don't think I have anything more to say. Thank you, Mr. Weir. Mr. Zim? You have three minutes. Your Honor, the first point I want to make is that there's plenty of support in the record that you compare the preferred therapeutic doses. The Barrett-Dawes and Freeman articles all say that. And if you look at A1357, A1365, A1439, you'll see they were comparing therapeutic, not identical doses. Secondly, we made the argument in our blue brief, loudly and clearly. We made the argument in our gray brief, loudly and clearly. Not once did any one of the defendants argue that they disagreed that you use the preferred therapeutic dose. All they said was we didn't mention 60. They didn't say we couldn't use our preferred therapeutic dose. Mr. Weir says that if you followed our approach, you'd never have summary judgment in inequitable conduct cases. Well, I don't want to rely on the cases that say this, but the fact is case after case after case says that it is rare that you will grant summary judgment in inequitable conduct cases because of the intent element, because you need to look at witnesses, and that didn't happen here. Mr. Weir referred to Paragraph 2 of Example 6 and said that that mentions that under identical dosage conditions, and those words weren't used in Paragraph 3 of 4. Well, that proves our case, not his case, because it suggests that if they wanted to say that under identical dosage conditions, they would have said that. All that Dr. Huzon did was follow the conventional practice. Mr. Weir says that the articles cited in the record 1391, 1437, and 1440 don't support the notion of dose independence of the debris compounds. Well, if you look at those pages, 1391, 1437, and 1440, you will see that they indeed do support it. He said there's no support for bleeding. Well, the support is the Huzon testimony, and basic rules of summary judgment jurisprudence are that you accept the testimony of the party against whom summary judgment is directed. This judge did not accept the testimony of Dr. Huzon on point after point after point, and I suggest that all of this discussion, everything you've heard from Mr. Weir, reinforces the notion that there are enormous disputed issues of material fact in this case. This case should not be decided ultimately on the merits at this point in the case. It should be decided ultimately on the merits only after a trial, when Dr. Huzon can come to the court, when the judge can look at him and evaluate whether he's telling the truth or whether he's not telling the truth. Mr. John Moore, Your Honor. I'll rise. The honorable court is adjourned from day to day. Thank you.